Sharre Lotfollahi (SBN 258913)
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, California 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900
slotfollahi@kirkland.com

Joshua L. Simmons (*pro hac vice* forthcoming)
Jeanna M. Wacker (*pro hac vice* forthcoming)
Ashley Ross (*pro hac vice* forthcoming)
Joshua C. Berlowitz (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.simmons@kirkland.com
jeanna.wacker@kirkland.com
ashley.ross@kirkland.com
josh.berlowitz@kirkland.com

*[Additional counsel listed in signature block]*

*Attorneys for Plaintiff*
*ELI LILLY AND COMPANY*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELI LILLY AND COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>SDBODYCONTOURING, A MEDICAL CORPORATION D/B/A ZEPBOUND PRESCRIPTION CLINIC D/B/A ZEPBOUND RX CLINIC D/B/A SAN DIEGO BODY CONTOURING,<br><br>Defendant. | Case No. **'24CV1061 RSH SBC**<br><br>**COMPLAINT FOR TRADEMARK INFRINGEMENT, FALSE ADVERTISING, FALSE DESIGNATION OF ORIGIN, AND CYBERSQUATTING**<br><br>**DEMAND FOR A JURY TRIAL** |

## INTRODUCTION

1.     This is an action to protect patients from unstudied, unapproved, and unsafe drugs masquerading as Plaintiff Eli Lilly and Company's ("Lilly") FDA-approved medicines for adults with type 2 diabetes, obesity, or excess weight and weight-related medical problems.  Defendant SDBodyContouring, A Medical Corporation d/b/a Zepbound Prescription Clinic d/b/a Zepbound Rx Clinic d/b/a San Diego Body Contouring ("Defendant") has designed its websites, social media, and advertising materials to deceive patients into thinking Defendant offers a way to obtain Lilly's clinically studied medicines, when in reality Defendant offers no such thing.[1]  Lilly therefore brings this action under federal and state law to protect patients from Defendant's dangerous, deceptive, and unlawful practices.

2.     For nearly 150 years, Lilly has worked tirelessly to develop and deliver trusted and innovative medicines that meet critical and unmet patient needs.  Lilly's proprietary MOUNJARO® and ZEPBOUND® are two such first-of-their-kind medicines, which are indicated for the serious conditions afflicting many tens of millions of Americans.  To advance treatment of these chronic conditions, Lilly used its extensive experience with world-class medicines to develop the brand-new class of GLP-1 (glucagon-like peptide-1) and GIP (glucose-dependent insulinotropic polypeptide) dual-receptor agonists, which includes tirzepatide, the active ingredient in Lilly's MOUNJARO® and ZEPBOUND®.  Lilly's MOUNJARO® and ZEPBOUND® are the only FDA-approved GLP-1/GIP medicines.

3.     Before obtaining FDA approval, Lilly's new medicines underwent years-long clinical trials, which tested them for safety, quality, and effectiveness on thousands of patients.  When approving these medicines, the FDA called Lilly's "novel" MOUNJARO® an "important advance" and observed that Lilly's ZEPBOUND® "addresses an unmet medical need."

---

[1]     In support of this Complaint, Lilly's allegations are upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.

https://web.archive.org/web/20221028212253/https://www.fda.gov/news-events/press-announcements/fda-approves-novel-dual-targeted-treatment-type-2-diabetes (archived FDA MOUNJARO® approval press announcement); https://www.fda.gov/news-events/press-announcements/fda-approves-new-medication-chronic-weight-management (FDA ZEPBOUND® approval press announcement).

4.     Compounded products sold as "tirzepatide," meanwhile, are not approved or even reviewed by the FDA.  Pharmacies currently offering compounded versions of tirzepatide are not required to follow the FDA's "good manufacturing practices," nor to comply with the same controls on sterility and safe storage as manufacturers of FDA-approved medicines. They are also not required to report adverse events—an important regulatory requirement imposed on manufacturers of FDA-approved medicines for patient safety.  Compounded drugs are not tested for safety, quality, or efficacy in clinical trials.  Accordingly, and as the FDA has warned, "compounded drugs pose a higher risk to patients than FDA-approved drugs," such as MOUNJARO® and ZEPBOUND®.  https://www.fda.gov/drugs/human-drug-compounding/drug-compounding-and-drug-shortages (FDA explainer on Drug Compounding).

5.     Defendant falsely and unlawfully trades on Lilly's goodwill, offering unproven and unapproved compounded drugs as if they were genuine Lilly medicines. But Defendant does not offer Lilly's proprietary MOUNJARO® and ZEPBOUND® medicines.  Indeed, Defendant's drugs have undergone *none* of the rigorous studies or approval processes that Lilly's medicines have.  Passing Defendant's compounded drugs off as Lilly's MOUNJARO® and ZEPBOUND® is not merely deceptive—it's dangerous.

6.     Defendant's intentional deception of patients starts with one of its website domain names—"zepboundclinic.com"—which it uses to lure patients

looking for ZEPBOUND® to Defendant's business.  Defendant further holds itself out to the public as "Zepbound Rx Clinic" or "Zepbound Prescription Clinic."

7.     When patients arrive at the Zepbound Rx Clinic website, the deception continues.  Defendant's website describes "ZEPBOUND (tirzepatide, Mounjaro®)" as a "treatment of choice," and includes a picture of Lilly's ZEPBOUND® autoinjector pen, as shown below.



8.     But in another section of this homepage titled "TIRZEPATIDE COMPOUNDED EXCLUSIVELY FOR OUR PATIENTS," Defendant displays the following image:



9.     The vial depicted, which purports to be a compounded product containing tirzepatide, is labeled "(MOUNJARO) FOR WEIGHT LOSS" in a blatant attempt to associate Defendant's unapproved compounded drug with genuine Lilly MOUNJARO®.  But genuine MOUNJARO® is not a compounded drug, nor is it indicated "for weight loss."

10.    Lilly therefore brings this action pursuant to the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, and for violation of California's statutory and common law regarding unfair and deceptive competition.  Lilly's claims arise out of Defendant's infringement of Lilly's rights in the MOUNJARO® and ZEPBOUND® trademarks and

Defendant's acts of cybersquatting, false designation of origin, false advertising, and unfair competition.

## THE PARTIES

11.     Plaintiff Lilly is a corporation organized and existing under the laws of Indiana and has its principal place of business in Indiana.

12.     Defendant is a California corporation with a principal place of business at 8690 Center Drive, La Mesa, California 91942 in this District.  Its sole registered agent and owner is Charles J. Sarosy, with registered agent address 8690 Center Drive, La Mesa, California 91942.  Defendant additionally does business as Zepbound Prescription Clinic, Zepbound Rx Clinic, and San Diego Body Contouring.

13.     Defendant also does business using the domain names "zepboundclinic.com" and "sdbodycontouring.com."

## JURISDICTION AND VENUE

14.     The Court has subject matter jurisdiction over the Lanham Act causes of action pleaded herein pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338(a).  The Court has supplemental jurisdiction over the state and common law causes of action pleaded herein pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant operates and conducts business in this District.  Defendant is subject to personal jurisdiction in this District.

### LILLY'S FDA-APPROVED TIRZEPATIDE MEDICINES: MOUNJARO® AND ZEPBOUND®

16.     Lilly's MOUNJARO® is a novel treatment for type 2 diabetes, a chronic and progressive condition facing more than 30 million Americans.  As the FDA has noted, "Despite the availability of many medications to treat diabetes, many patients do not achieve the recommended blood sugar goals." https://web.archive.org/web/20221028212253/https://www.fda.gov/news-events/press-announcements/fda-approves-novel-dual-targeted-treatment-type-2-

diabetes (archived FDA MOUNJARO® approval press announcement).
MOUNJARO® targets this problem head-on using an innovative active
pharmaceutical ingredient, tirzepatide.  Before it received FDA approval, Lilly's
MOUNJARO® was clinically proven to improve blood sugar control "more
effective[ly] than the other diabetes therapies with which it was compared in clinical
studies." *Id.*

17.   The FDA approved MOUNJARO® and indicated it in addition to diet and
exercise to improve glycemic control in adults with type 2 diabetes mellitus.  As part
of the approval process, Lilly submitted data on safety, quality, and effectiveness
collected through clinical trials involving thousands of patients.  Lilly's
MOUNJARO® is thus proven safe and effective when used as directed.

18.   In addition to MOUNJARO®, Lilly markets and sells ZEPBOUND®,
another proprietary, FDA-approved treatment option containing the active
pharmaceutical ingredient tirzepatide.  With ZEPBOUND®, Lilly aims to help the
many dozens of millions of American adults with obesity or with excess weight and
weight-related medical problems lower their risks of cardiovascular disease and other
leading causes of death.  As the FDA has noted, ZEPBOUND® "addresses an unmet
medical need" by targeting "chronic weight management (weight reduction and
maintenance)" through a new method of hormone receptor activation.
https://www.fda.gov/news-events/press-announcements/fda-approves-new-
medication-chronic-weight-management (FDA ZEPBOUND® approval press
announcement).

19.   As with MOUNJARO®, the safety, quality, and effectiveness of
ZEPBOUND® was established through rigorous clinical trials featuring thousands of
patients.  The FDA recently approved ZEPBOUND® and indicated it for adults with
obesity (with a BMI of 30 kg/m2 or greater) or those who are overweight (with a BMI
≥ 27 kg/m2 or greater) and also have at least one weight-related additional condition,

such as hypertension (high blood pressure), dyslipidemia (high cholesterol or fats in blood), type 2 diabetes mellitus, obstructive sleep apnea, or cardiovascular disease, to lose weight.  It should be used with a reduced-calorie diet and increased physical activity.

20.    Lilly's tirzepatide medicines are the result of billions of dollars of investments in research and development, which included dozens of studies and trials.

21.    Countless highly specialized personnel ensure Lilly medicines meet quality and safety standards.  Lilly manufactures its medicines under strict controls in state-of-the-art facilities.  Transforming tirzepatide API to medicine is a complex, methodical, and science-based process.  Lilly follows Good Manufacturing Practices (GMP), which are regulations that "provide[] for systems that assure proper design, monitoring, and control of manufacturing processes and facilities." https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practice-cgmp (FDA explainer on GMP).  GMPs include "establishing strong quality management systems, obtaining appropriate quality raw materials, establishing robust operating procedures, detecting and investigating product quality deviations, and maintaining reliable testing laboratories." *Id.*  GMPs help "prevent instances of contamination, mix-ups, deviations, failures, and errors." *Id.*

22.    Each step in Lilly's process to manufacture its tirzepatide medicines— from sourcing and chemical synthesis of the API to formulation and device assembly and packaging—requires extensive testing and controls and specialized equipment. Lilly's medicines must be, and always are, accompanied with important, FDA-approved labels, instructions, and warnings.

23.    Lilly now promotes, offers, and sells MOUNJARO® and ZEPBOUND® medicines in California and throughout the United States.

## LILLY'S MOUNJARO® AND ZEPBOUND® TRADEMARKS

24.     Lilly uses the trademarks MOUNJARO® and ZEPBOUND® (the "Lilly Marks") to identify and promote Lilly's proprietary, FDA-approved medicines with the active ingredient tirzepatide.  Lilly markets and sells MOUNJARO® and ZEPBOUND® throughout the United States using the Lilly Marks.

25.     Lilly first adopted and used the MOUNJARO® mark at least as early as June 3, 2022, and has used the MOUNJARO® mark continuously since that time.  Lilly has extensively promoted, advertised, and marketed its prescription-only diabetes medicine bearing the MOUNJARO® mark in many different channels, directed both to healthcare professionals and to patients.

26.     Lilly is the owner of two federal trademark registrations for MOUNJARO®, U.S. Reg. Nos. 6,809,369 (issued August 2, 2022) and 7,068,463 (issued May 30, 2023).  True and correct copies of Plaintiff Lilly's registrations for the MOUNJARO® mark are attached hereto as part of **Exhibit A.**  Lilly additionally has several pending applications to register its MOUNJARO® mark in connection with more classes, services, and goods, including U.S. Trademark Ser. Nos. 97/596,856, 97/668,206, and 98/253,743.  As a result of its use of the MOUNJARO® mark, Lilly also owns valuable common law and other rights in and to the MOUNJARO® mark.

27.     Lilly first adopted and used the ZEPBOUND® mark at least as early as November 30, 2023, and has used the ZEPBOUND® mark continuously since that time.  Lilly has extensively promoted, advertised, and marketed its prescription-only weight-loss medicine bearing the ZEPBOUND® mark in many different channels, directed both to healthcare professionals and to patients.

28.     Lilly is the owner of one federal trademark registration for ZEPBOUND®, U.S. Reg. No. 7,288,373 (issued January 23, 2024).  A true and correct copy of Plaintiff Lilly's registration for the ZEPBOUND® mark is attached hereto as **Exhibit A.**  Lilly additionally has several pending applications to register its

ZEPBOUND® mark, including U.S. Trademark Ser. Nos. 97/530,451, 97/530,456, and 98/295,137.  As a result of its use of the ZEPBOUND® mark, Lilly also owns valuable common law and other rights in and to the ZEPBOUND® mark.

29.    Lilly conceived the Lilly Marks to stand out in the marketplace.  The Lilly Marks do not describe any attributes of either medicine and are accordingly inherently distinctive.

30.    Lilly promotes, advertises, and markets MOUNJARO® and ZEPBOUND® both to healthcare professionals and to patients, among others, through various channels, including on the websites mounjaro.com, mounjaro.lilly.com, zepbound.com, and zepbound.lilly.com, in social media, in online advertisements, and on television.

31.    As a result of Lilly's use, promotion, advertising, and marketing of MOUNJARO® and ZEPBOUND®, the Lilly Marks are exclusively associated with Lilly, serve to identify genuine Lilly products, and are valuable assets of Lilly.

## THE RISKS OF COMPOUNDING

32.    Upon information and belief, Defendant markets and sells to patients compounded drug products that purport to contain tirzepatide and that are not approved by the FDA or any other global regulatory agency ("Unapproved Compounded Drugs").

33.    Typically, prescription medicines must undergo a rigorous premarket approval process.  Federal law creates a narrow exception for compounding, which the FDA defines as a "practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes, or alters ingredients of a drug to create a medication tailored to the needs of an individual patient."  https://www.fda.gov/drugs/guidance-compliance-regulatory-information/human-drug-compounding (FDA guidance on drug compounding law compliance).  This narrow exception applies, for instance,

where a patient cannot safely take a commercially manufactured FDA-approved drug due to an allergy to a particular dye.

34.     The Food, Drug, and Cosmetic Act (FDCA), in section 503A, prescribes a rigid set of requirements that compounding pharmacies must meet, including a requirement that compounding occur only "on the prescription order that a compounded product is necessary for the identified patient."  This restriction is important because compounding pharmacies are not required to comply with GMP, so they are only permitted to produce a small amount based on the specific needs of specific patients.  The FDA has explained the importance of this requirement to ensure that compounding pharmacies "are not actually operating as conventional manufacturers":

> The longer a compounded sterile drug product that has been contaminated is held by a pharmacist or physician before distribution, or held in inventory in a health care facility before administration, the greater the likelihood of microbial proliferation and increased patient harm.  Because of these and other risks, the FD&C Act places conditions on compounding that must be met for compounded drugs to qualify for the exemptions in section 503A, [including that] compounding is for an identified individual patient, drugs compounded in advance of receiving prescriptions are compounded only in limited quantities, and drugs are distributed pursuant to a valid patient-specific prescription.  These conditions are meant to help ensure that compounding under section 503A is based on individual patient needs, and that entities purportedly operating under section 503A are not actually operating as conventional manufacturers.

https://www.fda.gov/media/97347/download (FDA prescription requirement compliance guidance for industry).

35.     As the FDA further explained, "The *prescription requirement* under section 503A is a critical mechanism to distinguish compounding by a licensed pharmacist or licensed physician from conventional manufacturing, and to ensure that drug products compounded under section 503A, which are not FDA-approved, are not subject to the requirement that labeling bear adequate directions for use, and are not subject to [ ]GMP requirements, are provided to a patient only based on individual patient need." *Id.* (emphasis in original).

11

36.     Compounders are also limited in their ability to engage in a practice called anticipatory compounding, which is when, "based on a history of receiving prescriptions for a particular drug product to be compounded for an identified individual patient, and in the context of an established relationship with a particular prescriber or patient, a pharmacist or physician will compound a batch of drugs in anticipation of receiving another patient-specific prescription. The compounder then provides the drugs to a patient or health care provider when a prescription for an identified individual patient is received." *Id.* As the FDA further explained:

> [A]nticipatory compounding [] has risks. For example, if a problem occurs during compounding, such as contaminating a drug product that is supposed to be sterile, or producing subpotent or superpotent sterile or non-sterile drugs, it could affect numerous patients, and not just one. Because drug products compounded in accordance with section 503A are exempt from CGMP requirements, there is an inherently greater chance of a production mistake or contamination. Restricting anticipatory compounding to limited quantities serves to limit the number of patients likely to be affected if there are drug product mix-ups or contamination. The limitations on anticipatory compounding in section 503A (i.e., compounding must be in "limited quantities" and based on an "established relationship") help to protect patients from product quality issues. ***These limitations on anticipatory compounding also help to distinguish licensed pharmacists or licensed physicians compounding drug products under section 503A for individual patients from conventional manufacturers, who generally produce larger quantities of drugs that are distributed without a prescription***.

*Id.* (emphasis added).

37.     According to the FDA, "[c]ompounded drugs are not FDA-approved. This means that FDA does not review these drugs to evaluate their safety, effectiveness, or quality before they reach patients." The FDA has warned that: "Compounded drugs . . . do not have the same safety, quality, and effectiveness assurances as approved drugs.  Unnecessary use of compounded drugs unnecessarily exposes patients to potentially serious health risks.  Because compounded drugs are not FDA-approved, FDA does not verify their safety, effectiveness, or quality before they are marketed."  https://www.fda.gov/drugs/human-drug-

compounding/compounding-and-fda-questions-and-answers. (FDA drug compounding FAQ).

38.     Health risks from compounded drugs are serious.  In 2021, a pharmacist pled guilty to providing adulterated compounded drugs to cataract surgery patients. The adulterated compounds contained "an excessive amount of an inactive ingredient" that can damage sensitive eye tissue.  *See* https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/press-releases/texas-pharmacist-pleads-guilty-adulterating-drug-used-cataract-surgeries.  At least 68 patients were injected with the adulterated compounds, at two different surgery centers, over a period of months, even though patients suffered near-immediate adverse events, including permanent blindness.  *See* hhttps://www.wfaa.com/article/news/do-not-publish-yet/287-5f002ed3-e110-4063-9959-a2e5f54b5097 (WFAA article re outbreak).  One patient had believed "every pill you take, every shot you take is tested" and was surprised to learn that compounded drugs were neither fully tested nor deemed safe or otherwise approved by the FDA.  *Id.*

39.     There are countless other examples of people experiencing serious injury from taking unregulated medicines.  Inappropriate drug compounding caused at least 73 reported compounding errors between 2001 and 2019.  These errors led to more than 1,562 adverse events and at least 116 deaths. https://www.pewtrusts.org/en/research-and-analysis/data-visualizations/2020/us-illnesses-and-deaths-associated-with-compounded-or-repackaged-medications-2001-19 (U.S. Illnesses and Deaths Associated With Compounded or Repackaged Medications, 2001–19).

40.     Lilly has seen problems first-hand for compounded tirzepatide.  Lilly has discovered compounded drugs advertised as tirzepatide with safety, sterility, and efficacy problems.  Some contain bacteria, high impurity levels, different colors (pink, instead of colorless), or a chemical structure different from the tirzepatide in Lilly's

FDA-approved medicines.  In at least one instance, Lilly saw nothing more than sugar alcohol.  Lilly also has received reports of patients experiencing significant adverse events after being injected with non-Lilly tirzepatide, including a patient who experienced a seizure and was admitted to the Intensive Care Unit and other patients who experienced severe allergic reactions.  According to the FDA's Adverse Events Reporting System (FAERS), to date, over 150 adverse events associated with compounded or so-called (but not actually) "generic" tirzepatide have been reported, including over 100 "serious cases" and at least 5 deaths.

41.     Consequences from compounded drugs may be deadly.  In October 2012, compounded drugs contaminated with a fungus were shipped throughout the country and later injected into patients' spines and joints.  After these contaminated products were injected into nearly 14,000 patients, more than 60 people died of fungal meningitis.  *Id.*  Regarding this outbreak, the FDA has written:

> The 2012 fungal meningitis outbreak was not an isolated event. It was the most serious in a long history of serious adverse events associated with contaminated, super-potent, mislabeled, or otherwise poor quality compounded drugs. In addition, many serious adverse events linked to poor quality compounded drugs, including outbreaks of infections and deaths have occurred since then. And, because most compounders do not report adverse events to FDA, the agency may not be aware of adverse events associated with compounded drugs unless a health care provider submits an adverse event report regarding his or her patients or a state official notifies FDA.

https://www.fda.gov/media/102493/download (FDA Compounding Progress Report).

### WIDESPREAD SAFETY CONCERNS
### ABOUT COMPOUNDED TIRZEPATIDE

42.     Regulators and law enforcement across the United States and abroad have recognized the safety concerns with compounded tirzepatide and other incretins. They have issued warnings, and in at least one instance, banned incretin compounding.

43.     The FDA, for example, has consistently and repeatedly raised its concerns with compounding generally and compounded incretins more specifically. https://www.fda.gov/media/97347/download (FDA prescription requirement compliance guidance for industry).  The FDA specifically has targeted compounded tirzepatide as a threat to consumer safety.  The Director of the FDA's Office of Unapproved Drugs and Labeling Compliance has issued multiple warning letters to compounding pharmacies purportedly selling compounded tirzepatide products because they are not safe or effective.  https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/us-chem-labs-669074-02072024 (FDA warning letter re US Chem Labs); https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/synthetix-inc-dba-helix-chemical-supply-668918-02072024 (FDA warning letter re Synthetix Inc. DBA Helix Chemical Supply).

44.     Across the country, at least nine state pharmacy boards, along with several state poison centers, have issued guidance and warnings regarding the risks to patients of compounded incretins.  The Alabama Board of Pharmacy notified all licensed pharmacists and pharmacies that "even when compounding of [incretins] is allowable under [federal law], . . . the use of any non-pharmaceutical grade active pharmaceutical ingredient (API), or one not produced by an FDA-registered establishment, is prohibited."  https://www.albme.gov/press-release/concerns-with-semaglutide-and-other-glp-1-receptor-agonists (Alabama Board of Medical Examiners press release).  And the Maryland Poison Control Center warned that buying compounded incretins "online puts people at risk due to the medicine not being regulated and/or being sold from a source that is not licensed," including because those compounded products "have not been evaluated for safety and effectiveness by the FDA."  https://blog.mdpoison.com/2024/03/semaglutide (Blog of the Maryland Poison Center).

45.     The issue of unsafe compounded drugs purporting to contain tirzepatide has also received international attention.  Australia recently banned the development and sale of compounded anti-obesity medications because of "increasing community concern" and "increasing reports of patients coming to harm from" compounded incretin drugs.  The ban—effective October 2024—targets compounded drugs that are "being misrepresented and sold as replica [] Mounjaro®." https://www.health.gov.au/ministers/the-hon-mark-butler-mp/media/protecting-australians-from-unsafe-compounding-of-replica-weight-loss-products (Australia Minister for Health and Aged Care press release).  As Mark Butler, Australia's Minister for Health, said, "Australians should be able to have faith in the medications they use, including compounded medicines," and the ban "will protect Australians from harm and save lives."  *Id.*

46.     Doctors and patient groups recognize the problems with compounded incretins, and they are sharing their concerns, too.  The Obesity Society, Obesity Action Coalition, and Obesity Medicine Association, for example, issued a joint statement warning that when people use incretin "alternatives, you may not be getting what you hoped for.  You may also get something you did not want (other active substances have been found in some compounded versions)." https://www.obesityaction.org/wp-content/uploads/GLP-1-Compounded-Alternative-Statement_Final_Logos-1.pdf (joint statement from leading obesity expert organizations).

47.     Lilly itself has issued multiple public warnings about compounded tirzepatide, including by publishing an open letter.

### DEFENDANT'S FALSE ADVERTISING AND TRADEMARK INFRINGEMENT

48.     Lilly does not sell MOUNJARO® or ZEPBOUND® to Defendant for resale or redistribution.  Nor has Lilly authorized Defendant to use the Lilly Marks in connection with any of Defendant's offered goods or services.  On information and

belief, therefore, the Unapproved Compounded Drugs sold by Defendant are made by compounding pharmacies, which deliver them to Defendant for prescription, administration, or other dispensing to patients.

49. On information and belief, Defendant does not sell Lilly's MOUNJARO® and ZEPBOUND® and has no association with Lilly. Yet Defendant boldly and falsely appropriates the Lilly Marks to market and sell Unapproved Compounded Drugs purporting to contain tirzepatide. These drugs are *not* MOUNJARO® or ZEPBOUND®. Rather, Defendant passes off Unapproved Compounded Drugs as "Mounjaro" and/or "Zepbound." Defendant's unlawful use of the Lilly Marks can only be intended to deceptively lure in patients in pursuit of revenues and profits.

50. Because Defendant is not offering genuine MOUNJARO® or ZEPBOUND®, Lilly has no control over the safety, quality, or effectiveness of the Unapproved Compounded Drugs sold by Defendant.

51. Defendant also passes off as "Mounjaro" its own Unapproved Compounded Drugs for a use for which is not approved or indicated, namely weight loss.

52. Examples of Defendant's trademark infringement and false advertising are shown below and are attached hereto as **Exhibit B**.

53. An example of Defendant's unauthorized use of the Lilly Marks, on the homepage of one of Defendant's websites (https://zepboundclinic.com/), is shown below. This same banner appears on *every page* on this website.



ZEPBOUND Rx CLINIC: Tirzepatide & Semaglutide Medical Weight Loss

54. As the image shows, Defendant equates its Unapproved Compounded Drugs with "Zepbound." Defendant further holds itself out to the public as

"Zepbound Rx Clinic" and "Zepbound Prescription Clinic" despite having no affiliation with or license from Lilly, the owner of the exclusive right to use the ZEPBOUND® mark.

55.    At the top of the homepage of Defendant's zepboundclinic.com website, just below the "Zepbound Rx Clinic" banner, Defendant invites users to "Visit Zepbound Prescription Clinic to Achieve Your Weight Loss Goals," again unauthorizedly associating itself with Lilly's ZEPBOUND® mark.  Defendant even includes a picture of Lilly's patented Zepbound autoinjector pen.

56.    Further down the homepage, in a section entitled "TIRZEPATIDE COMPOUNDED EXCLUSIVELY FOR OUR PATIENTS," Defendant displays an image of a vial produced by Thrive Health Solutions, as shown below:



57.    Thrive Health Solutions describes this product as a "Generic form of Mounjaro and ZepBound."  https://thrivecolorado.com/services/weight-loss-clinic-in-denver/tirzepatide-in-denver/.  But there are **no** FDA-approved "generic" versions of

either MOUNJARO® and ZEPBOUND® available in the United States.  Rather, this is an Unapproved Compounded Drug.

58.    Moreover, the bottle in the image is labeled "TIRZEPATIDE (MOUNJARO) FOR WEIGHT LOSS."  Not only does this label convey to consumers that the product being sold is the same as Lilly's MOUNJARO® when it is not, but also the bottle conveys that MOUNJARO® has been approved for weight loss when it has not.

59.    From the homepage of zepboundclinic.com website, if a user clicks on the button labeled "Contact Us California," the user is directed to a page titled "About Us." https://zepboundclinic.com/contact-us-california. This page provides contact information for ZEPBOUND Rx CLINIC (San Diego Body Contouring).  The address listed is Defendant's principal place of business.

60.    The webpage further identifies Dr. Charles J. Sarosy, M.D. as the owner of "Zepbound Rx Clinic in San Diego, California."  If a user clicks on the button labeled "About Dr. Sarosy," the user is directed to "sdbodycountouring.com/contact/dr-charles-sarosy."  The phone number listed at the top right corner of this webpage matches the one provided on the "Contact Us California" page of "zepboundclinic.com."

61.    On the San Diego Body Contouring website (sdbodycontouring.com), if a user then hovers over the heading labelled "MED SPA" and selects "Tirzepatide" from the drop-down menu, they will arrive at a page titled "Tirzepatide Injections in La Mesa."  This page advertises "Tirzepatide injections in La Mesa for men and women who are looking to achieve a slimmer and healthier physique."  On information and belief, the "tirzepatide injections" being offered are not genuine Lilly MOUNJARO® or ZEPBOUND® but are Unapproved Compounded Drugs made by compounding pharmacies, including Thrive Health Solutions.

62.    Defendant also falsely advertises its Unapproved Compounded Drugs by making statements that claim or imply that its Unapproved Compounded Drugs are FDA-approved and have been proven to achieve certain therapeutic outcomes.  These statements rely on the FDA's approval of *Lilly's* medicines and clinical trials for *Lilly*'s medicines.  These studies and approvals have no bearing on, and cannot substantiate claims about, Defendant's Unapproved Compounded Drugs, which upon information and belief are sold without having undergone any clinical trials on safety and effectiveness.

63.    For example, Defendant's sdbodycountouring.com website states that "When looking at the data from research studies, it was found that Tirzepatide was much more potent and could result in greater fat loss compared to" another GLP-1 agonist.  The following sentence links to an article that analyzed results from Lilly's SURMOUNT-1 clinical trial.  The SURMOUNT® clinical trials studied *Lilly's* tirzepatide formulation and have no bearing on the Unapproved Compounded Drugs sold by Defendant.

64.    Defendant's false advertising extends to social media as well.  For example, Defendant's website has embedded in it a YouTube video titled "Instructional Video on Semaglutide & Tirzepatide Injections." https://www.youtube.com/watch?v=TMviq9606Eg.  In the video, Dr. Sarosy, Defendant's agent and identified owner, shows the product that Defendant offers, which is obviously not the ZEPBOUND® autoinjector pen advertised on the Zepbound Prescription Clinic website and produced by Lilly, as shown below:



65.     Moreover, in a Facebook post on May 1, 2024 shown below, Defendant advertises "tirzepatide" "Starting @ $119 a week."  Immediately below this, Defendant claims to offer the "Newest FDA approved weightloss [*sic*] injections." On information and belief, these statements are false and misleading as to Defendant's Unapproved Compounded Drugs, which are ***not*** "FDA approved."



66.     Defendant's online presence conveys the unmistakable impression that Defendant is offering for sale Lilly's MOUNJARO® and ZEPBOUND®, and/or otherwise FDA-approved weight loss injections containing tirzepatide that are the same as, or have the same source as, Lilly's MOUNJARO® and ZEPBOUND®.  But Lilly is the only approved source of MOUNJARO® and ZEPBOUND® in the United States, and Lilly does not sell either medicine to Defendant for resale or redistribution. Moreover, there are *no* "generic" versions of either MOUNJARO® and ZEPBOUND®.

67.     Defendant first started using the Lilly Marks to advertise its Unapproved Compounded Drugs long after Lilly had adopted them.  Defendant's use can only have been intended to benefit from the good will Lilly generated around the Lilly Marks.

68.     Upon information and belief, these statements are false and/or misleading as to Defendant's Unapproved Compounded Drugs, which are *not* MOUNJARO® or ZEPBOUND®, are *not* "FDA approved," and were *not* subjected to clinical trials, and therefore lack any "data from research studies."

69.     Defendant continues to use the Lilly Marks, including in advertising and promotion on its website and social media channels, to deceive patients who, upon information and belief, are seeking to buy but are in fact not buying genuine FDA-approved MOUNJARO® and/or ZEPBOUND® to treat their serious health conditions.

70.     Defendant's prominent and misleading use of the Lilly Marks is likely to cause consumers to falsely believe that they are purchasing MOUNJARO® and/or ZEPBOUND®, that Defendant is a source for Lilly's FDA-approved treatment options MOUNJARO® and/or ZEPBOUND®, that Defendant's Unapproved Compound Drugs are as safe and effective as Lilly's FDA-approved treatment options MOUNJARO® and ZEPBOUND®, and/or that Defendant's services are provided, licensed,

sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

71.     Defendant's use of the Lilly Marks is without the permission, consent, or authorization of Lilly.  Defendant has no right to use, and Defendant knows that it has no right to use, the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs or otherwise.  Defendant's advertising and promotional materials are false and misleading where they suggest and/or state an association with Lilly's FDA-approved MOUNJARO® and ZEPBOUND®, because no such association exists.

72.     There is no need for Defendant to use the Lilly Marks to advertise or promote its Unapproved Compounded Drugs purporting to contain tirzepatide, other than to trade upon Lilly's reputation and to create confusion in the marketplace and/or mislead patients with serious health conditions regarding the origin, identity, or source of Defendant's Unapproved Compounded Drugs.

73.     Defendant's unauthorized use of the Lilly Marks is intended—and likely—to cause confusion, to cause mistake, or to deceive, and infringes Lilly's established exclusive rights in the Lilly Marks.

74.     Upon information and belief, unless enjoined by this Court, Defendant will continue to use the Lilly Marks and/or otherwise falsely advertise its Unapproved Compounded Drugs as associated with or being MOUNJARO® and ZEPBOUND®, all in violation of Lilly's rights.

## DEFENDANT'S CYBERSQUATTING

75.     Upon information and belief, on November 8, 2023—the very day that the FDA approved Lilly's ZEPBOUND® medicine—Defendant registered the domain name "zepboundclinic.com."  This was long after Lilly first applied to register the ZEPBOUND® mark (on April 14, 2022) on an intent-to-use basis.

76.     Because Lilly filed its application to register the ZEPBOUND® mark before Defendant registered the domain name "zepboundclinic.com," Lilly has priority.

77.     Upon information and belief, when Defendant registered the domain name "zepboundclinic.com," Defendant took steps to conceal Defendant's ownership of the domain name.  For example, Defendant used a proxy server to register the domain name, as seen in publicly available WHOIS data. https://whois.domaintools.com/zepboundclinic.com (WHOIS data for "zepboundclinic.com").  A true and correct copy of WHOIS data for "zepboundclinic.com" is attached hereto as **Exhibit C**.

78.     The domain name used by Defendant includes Lilly's ZEPBOUND® mark in its entirety and is intended to falsely suggest that Defendant's business is associated with Lilly and/or Lilly's ZEPBOUND® medicine.

79.      Despite Defendant's use of the domain name "zepboundclinic.com," and the use of the Lilly Marks on Defendant's website, Defendant is not affiliated with Lilly in any way.   Indeed, Lilly has not authorized Defendant to use the ZEPBOUND® trademark in any way.

80.     Defendant's registration of the domain name "zepboundclinic.com" was a bad faith attempt by Defendant to trade on Lilly's reputation and goodwill and profit from Lilly's rights in the ZEPBOUND® trademark.

**HARM TO THE PEOPLE OF CALIFORNIA AND LILLY**

81.     Lilly's FDA-approved MOUNJARO® and ZEPBOUND® medications have undergone extensive clinical trials and approval processes.  But these clinical studies and FDA approvals only apply to genuine Lilly MOUNJARO® and ZEPBOUND® used as directed by a prescribing physician.  The clinical trials and approval processes do not inform the safety, quality, or effectiveness of Defendant's Unapproved Compounded Drugs.

82.     Defendant's unlawful, misleading business model may expose patients to the serious risks described above.  Critically, because Defendant falsely advertises and, without Lilly's consent, uses the Lilly Marks in connection with its Unapproved

Compounded Drugs, patients are unlikely to know the unique risks associated with Defendant's untested, unapproved drugs.

83.     Defendant advertises itself as providing MOUNJARO® and ZEPBOUND® (or their supposed "generic" equivalents), when in reality Defendant provides untested Unapproved Compounded Drugs.  Defendant's promotional tactics are ***intended*** to mislead patients into believing that Unapproved Compounded Drugs are backed by clinical trials and have been approved by the FDA, when no such studies have been conducted, and neither the FDA nor any other regulatory body has approved them.  Patients who take Defendant's Unapproved Compounded Drugs and suffer harm will have had no forewarning.

84.     Not only does this deceitful content expose the people of California to serious health risks, but Defendant's unlawful tactics undermine the name, goodwill, and reputation that Lilly has invested heavily in developing.  Moreover, Defendant's unfair methods allow it and its suppliers of Unapproved Compounded Drugs to unjustly profit from sales to patients looking for MOUNJARO® and ZEPBOUND®.

**FIRST CAUSE OF ACTION**
**Trademark Infringement**
**in Violation of 15 U.S.C. § 1114**

85.     Lilly repeats and realleges each and every allegation above as if fully set forth herein.

86.     Lilly is the owner of all right, title, and interest in federal trademark registrations for the inherently distinctive Lilly Marks and has standing to maintain an action for trademark infringement under 15 U.S.C. § 1114.

87.     Without Lilly's consent, Defendant has used and continues to use in commerce the Lilly Marks in connection with the offering, sale, and advertising of its Unapproved Compounded Drugs purporting to contain tirzepatide.  Consumers who encounter Defendant's unauthorized use of the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs and related goods and services are

likely to think that they are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

88.    Defendant's actions are likely to cause confusion, or to cause mistake, or to deceive, and thus constitute trademark infringement of the registered Lilly Marks, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

89.    Defendant had actual and/or constructive knowledge of Lilly's rights prior to its infringing use of the Lilly Marks.  The actions of Defendant alleged above have at all times relevant to this action been willful.

90.    As a direct and proximate result of the actions of Defendant alleged above, Lilly has been damaged and will continue to be damaged.  Defendant's conduct, unless enjoined by the Court, will further impair the value of the Lilly Marks' name, reputation, and goodwill. This harm constitutes an injury for which Lilly has no adequate remedy at law.

91.    This is an exceptional case under 15 U.S.C. § 1117.

92.    Based on such conduct, Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including Defendant's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

### SECOND CAUSE OF ACTION
**Trademark Infringement, False Designation of Origin and Unfair Competition in Violation of 15 U.S.C. § 1125**

93.    Lilly repeats and realleges each and every allegation above as if fully set forth herein.

94.    Lilly is the owner of all right, title, and interest in the inherently distinctive Lilly Marks and has standing to maintain an action for trademark infringement, false designation of origin, and unfair competition under 15 U.S.C. § 1125.

95.    Without Lilly's consent, Defendant has used and continues to use in commerce the Lilly Marks in connection with the offering, sale, and advertising of its

Unapproved Compounded Drugs purporting to contain tirzepatide.  Consumers who encounter Defendant's unauthorized use of the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs and related goods and services are likely to think that they are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

96.     Defendant's actions are likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of the products and services and commercial activities of Defendant, and thus constitute trademark infringement, false designation of origin, and unfair competition with respect to the Lilly Marks, in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

97.     Defendant had actual and/or constructive knowledge of Lilly's rights prior to its infringing use of the Lilly Marks.  The actions of Defendant alleged above have at all times relevant to this action been willful.

98.     As a direct and proximate result of the actions of Defendant alleged above, Lilly has been damaged and will continue to be damaged.  Defendant's conduct, unless enjoined by the Court, will further impair the value of the Lilly Marks' name, reputation, and goodwill.  This harm constitutes an injury for which Lilly has no adequate remedy at law.

99.     This is an exceptional case under 15 U.S.C. § 1117.

100.   Based on such conduct, Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including Defendant's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

### THIRD CAUSE OF ACTION
**False and Misleading Advertising and Promotion
in Violation of 15 U.S.C. § 1125(a)(1)(B)**

101. Lilly repeats and realleges each and every allegation above as if fully set forth herein.

102. Defendant's commercial advertising claims described herein are false and misleading in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

103. Defendant has knowingly and willfully made material false and misleading statements in its commercial advertisements for its Unapproved Compounded Drugs, and these statements regarding the Unapproved Compounded Drugs' safety, quality, effectiveness, and regulatory status have influenced and are likely to continue to influence consumers' purchasing decisions.

104. Defendant's statements—including its various literally false claims—have the tendency to deceive a substantial segment of consumers, who have relied or likely will rely on Defendant's false statements in making their tirzepatide-based medicine purchase decisions.

105. Defendant has caused its false statements to enter interstate trade or commerce.

106. As a direct and proximate result of Defendant's false and deceptive campaign, Lilly is suffering immediate and continuing irreparable injury for which there is no adequate remedy at law.

107. As a direct and proximate result of Defendant's false and deceptive campaign, Lilly has suffered and will continue to suffer significant monetary damages and discernible competitive injury by the direct diversion of sales from Lilly to Defendant and Defendant's suppliers and by a loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® and the Lilly Marks.

108. This is an exceptional case under 15 U.S.C. § 1117.

109.   Lilly is entitled to injunctive relief as well as monetary damages, and other remedies provided by Sections 1116, 1117, and 1118, including Defendant's profits, treble damages, reasonable attorneys' fees, costs, and prejudgment interest.

**FOURTH CAUSE OF ACTION**
**Cybersquatting**
**in Violation of 15 U.S.C. § 1125(d)**

110.   Lilly repeats and realleges each and every allegation above as if fully set forth herein.

111.   Lilly is the owner of all right, title, and interest in the inherently distinctive Lilly Marks as well as a federal trademark registration for the ZEPBOUND® mark.

112.   Lilly has not authorized Defendant to use the Lilly Marks as a portion of an Internet domain name.

113.   Defendant is the domain name registrant for the domain name "zepboundclinic.com," which Defendant uses to redirect consumers to Defendant's website.

114.   Defendant's domain name "zepboundclinic.com" includes the ZEPBOUND® mark in its entirety, coupled with a word indicating a facility where patients receive medical care and treatment.

115.   The domain name "zepboundclinic.com" used by Defendant is confusingly similar to Lilly's ZEPBOUND® mark.

116.   Defendant's registration and use of the domain name "zepboundclinic.com" commenced long after Lilly first filed an application to register the ZEPBOUND® mark, indicating Lilly's intent to use the ZEPBOUND® mark in commerce.  When the FDA approved ZEPBOUND® on November 8, 2023, the U.S. PTO records already reflected the ZEPBOUND® mark's affiliation with Lilly. Defendant therefore had actual and/or constructive knowledge of Lilly's rights prior to its registration and use of the domain name "zepboundclinic.com," which

demonstrates Defendant's bad faith intent to profit from Lilly's ZEPBOUND® mark, goodwill, and reputation.

117.   Defendant's acts are willful and malicious.

118.   Defendant's registration and use of the "zepboundclinic.com" domain name constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Lilly to relief.

119.   Unless the "zepboundclinic.com" domain name registration is forfeited, canceled, or transferred to Lilly, Defendant will in fact profit, as described above. Lilly's remedy at law is not adequate to compensate it for the injuries inflicted by Defendant by its acts of cybersquatting.  Lilly is therefore entitled to preliminary and permanent injunctive relief pursuant to 15 U.S.C. § 1116.

120.   By reason of Defendant's acts of cybersquatting alleged herein, Lilly is entitled to recover Defendant's profits and Lilly's actual damages, or, at Lilly's election, an award of statutory damages under 15 U.S.C. § 1117(d); the costs of this action; and an order of the Court transferring the "zepboundclinic.com" domain name to Lilly.

121.   This is an exceptional case under 15 U.S.C. § 1117.

122.   Lilly is entitled to injunctive relief and Lilly's actual damages, or, at Lilly's election, an award of statutory damages under 15 U.S.C. § 1117(d); the costs of this action; and an order of the Court transferring the "zepboundclinic.com" domain name to Lilly, as well as other remedies provided by Sections 1116, 1117, and 1118, including Defendant's profits, reasonable attorneys' fees, costs, and prejudgment interest.

### FIFTH CAUSE OF ACTION
**False and Misleading Advertising
in Violation of Cal. Bus. & Prof. Code § 17500**

123.   Lilly repeats and realleges each and every allegation above as if fully set forth herein.

124.   Defendant's commercial advertising claims described herein are false and misleading in violation of Cal. Bus. & Prof. Code § 17500.

125.   Defendant has knowingly made false and misleading statements in its commercial advertisements for its Unapproved Compounded Drugs and related goods and services addressed to the public and a substantial number of consumers.  These statements regarding Unapproved Compounded Drugs' safety, quality, effectiveness, and regulatory status have influenced and are likely to continue to influence consumers' purchasing decisions.

126.   Defendant's statements—including its various literally false claims— have the tendency to deceive a substantial segment of reasonable consumers, who have relied or likely will rely on Defendant's false statements in making their tirzepatide-based medicine and service purchase decisions.

127.   As a direct and proximate result of Defendant's false and misleading advertising campaign, Lilly has suffered and will continue to suffer significant monetary damages and discernible competitive injury by the direct diversion of sales from Lilly to Defendant and by a loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® medicines and the Lilly Marks.

128.   By reason of Defendant's acts, Lilly has been injured and is thereby entitled to the recovery of damages.

129.   Because Defendant has violated and continues to violate § 17500, Lilly is entitled to entry of preliminary and permanent injunctive relief, including disgorgement of Defendant's unjustly obtained profits from the sale of its Unapproved Compounded Drugs and related goods and services.

### SIXTH CAUSE OF ACTION
**Unlawful, Unfair, and Fraudulent Business Practices
in Violation of Cal. Bus. & Prof. Code § 17200 *et seq*.**

130.   Lilly repeats and realleges each and every allegation above as if fully set forth herein.

131.   The above-described acts of Defendant constitute unlawful, unfair, and fraudulent business practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL").

132.   Without Lilly's consent, Defendant has used and continues to use in commerce the Lilly Marks in connection with the offering, sale, and advertising of its Unapproved Compounded Drugs purporting to contain tirzepatide.  Consumers who encounter Defendant's unauthorized use of the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs and related goods and services are likely to think that they are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

133.   Defendant's actions are likely to cause confusion, or to cause mistake, or to deceive the public and consumers as to the origin, sponsorship, or approval of the products and services and commercial activities of Defendant, and thus constitute unlawful, unfair, and deceptive trade practices with respect to the Lilly Marks, in violation of the UCL.

134.   Defendant had actual and/or constructive knowledge of Lilly's rights prior to its infringing use of the Lilly Marks.  The actions of Defendant alleged above have at all times relevant to this action been willful.

135.   Defendant's actions additionally include deceptively relying on Lilly's clinical trials for MOUNJARO® and ZEPBOUND® to advertise Defendant's Unapproved Compounded Drugs.  These representations amount to false assurances of the safety, quality, and effectiveness of Defendant's Unapproved Compounded Drugs.

136.   Defendant's business practices are unlawful because independently actionable under the Lanham Act and California's false advertising law.

137.   Defendant's business practices are unfair because they are immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.

32

138.    Defendant's business practices are fraudulent because members of the public are likely to be deceived.

139.    As a direct and proximate result of the actions of Defendant alleged above, Lilly has been damaged and will continue to be damaged.  Defendant's conduct, unless enjoined by the Court, will further impair the value of the Lilly Marks' name, reputation, and goodwill.  This harm constitutes an injury for which Lilly has no adequate remedy at law.

140.    Members of the public are also likely to suffer injury from the above-described acts of Defendant by purchasing a drug that they believe to be genuine MOUNJARO® and ZEPBOUND®, not an Unapproved Compounded Drug.

141.    Under the principles of equity, Lilly is entitled to entry of preliminary and permanent injunctive relief as provided in Cal. Bus. & Prof. Code §§ 17203 and 17535, and other appropriate relief, including attorneys' fees pursuant to CCP § 1021.5.

**SEVENTH CAUSE OF ACTION**
**Trademark Infringement and Unfair Competition**
**in Violation of California Common Law**

142.    Lilly repeats and realleges each and every allegation above as if fully set forth herein.

143.    The above-described acts of Defendant constitute trademark infringement and unfair competition in violation of California common law.

144.    Without Lilly's consent, Defendant has used and continues to use in commerce the Lilly Marks to pass off its Unapproved Compounded Drugs purporting to contain tirzepatide as genuine MOUNJARO® and ZEPBOUND®.

145.    Defendant's unauthorized use of the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs and related goods and services is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of the products and services and commercial activities of Defendant.

146.   Consumers who encounter Defendant's unauthorized use of the Lilly Marks in connection with Defendant's Unapproved Compounded Drugs and related goods and services are likely to think that they are provided, licensed, sponsored, authorized, or approved by, or otherwise associated or affiliated with, Lilly.

147.   Defendant's actions thereby unfairly and wrongfully exploit and infringe Lilly's trademark, goodwill, and reputation.

148.   As a direct and proximate result of Defendant's trademark infringement and unfair methods of competition, Lilly has suffered and will continue to suffer significant monetary damages and discernible competitive injury by the direct diversion of sales from Lilly to Defendant and by a loss of goodwill associated with Lilly's MOUNJARO® and ZEPBOUND® medicines and the Lilly Marks.  Defendant therefore has unfairly profited from the actions alleged.

149.   By reason of Defendant's acts, Lilly's remedy at law is not adequate to compensate for the injuries inflicted by Defendant.  Accordingly, Lilly is entitled to entry of preliminary and permanent injunctive relief in addition to monetary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Lilly prays that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, but not limited to, the following:

1.   An Order declaring that Defendant:

    a.   Infringed the federally registered Lilly Marks, in violation of 15 U.S.C. § 1114(1);

    b.   Infringed the Lilly Marks and engaged in trademark infringement, false designation of origin, and unfair competition, in violation of 15 U.S.C. § 1125(a)(1)(A);

    c.   Engaged in false and misleading advertising and promotion, in violation of 15 U.S.C. § 1125(a)(1)(B);

    d.   Engaged in cybersquatting in violation of 15 U.S.C. § 1125(d);

e. Engaged in deceptive trade practices, false advertising, unfair competition, and trademark infringement in violation of Cal. Bus. & Prof. Code §§ 17200 *et seq.* and § 17500 and in violation of the common law of California;

f. That each of the above acts was willful and knowing.

2. An injunction preliminarily and then permanently enjoining and restraining Defendant and its officers, agents, servants, employees, and attorneys and all persons acting in concert or participation with any of them, from:

a. Using the Lilly Marks or any mark confusingly similar to them, in connection with the advertising, promoting, marketing, selling or offering for sale of any goods or services (including, but not limited to, Unapproved Compounded Drugs) or otherwise engaging in any activity that is likely to cause confusion, cause mistake, or deceive or otherwise infringe any rights of Plaintiff Lilly in the Lilly Marks or any similar mark;

b. Falsely stating or suggesting that Defendant's Unapproved Compounded Drugs are genuine or generic versions of MOUNJARO® or ZEPBOUND®, that Defendant is associated or connected in any way with Plaintiff or its products, or that Defendant's Unapproved Compounded Drugs are approved by the FDA, have been the subject of clinical studies, or achieve certain therapeutic outcomes;

c. Engaging in any unfair competition with Plaintiff Lilly; and

d. Engaging in any deceptive or unfair acts.

3. An Order Requiring Defendant and its officers, agents, servants, employees, and attorneys and all persons acting in concert or participation with any of them, to engage in corrective advertising by informing consumers that Defendant is

35

not and never has been authorized by, affiliated with, sponsored by, approved by, or related to Plaintiff Lilly or MOUNJARO® and ZEPBOUND®, that Defendant's Unapproved Compounded Drugs are not MOUNJARO® or ZEPBOUND®, that Defendant's Unapproved Compounded Drugs are not generic MOUNJARO® or generic ZEPBOUND®, that Defendant's Unapproved Compounded Drugs have never been genuine or generic versions of MOUNJARO® and ZEPBOUND®,  and that Defendant's Unapproved Compounded Drugs are not and have never been approved or reviewed by the FDA or tested for safety, quality, or effectiveness in clinical trials.

4.     An Order directing Defendant to file with this Court and serve on Lilly's attorneys, thirty (30) days after the date of entry of any injunction, a report in writing and under oath setting forth in detail the manner and form in which they have complied with the Court's injunction.

5.     An Order requiring Defendant to account for and pay to Lilly any and all profits arising from the foregoing acts of infringement, false designation of origin, false advertising, cybersquatting, and unlawful, unfair, and fraudulent business practices.

6.     An Order requiring Defendant to pay Lilly compensatory damages in an amount as yet undetermined caused by the foregoing acts of infringement, false designation of origin, false advertising, and unfair competition, and trebling such compensatory damages for payment to Lilly in accordance with 15 U.S.C. § 1117 and other applicable laws.

7.     An Order requiring the forfeiture or cancellation of the "zepboundclinic.com" domain name and/or the transfer of the domain name to Plaintiff Lilly, together with any other domain names containing "mounjaro" or "zepbound" in Defendant's ownership, possession, or control.

8.     An Order requiring that Defendant pay statutory damages under 15 U.S.C. § 1117(d), on election by Plaintiff Lilly.

9.    An Order for pre-judgment and post-judgment interest on all damages.

10.    An Order requiring Defendant to pay Lilly all types of monetary remedies available under California state law in amounts as of yet undetermined caused by the foregoing acts of infringement, false designation of origin, false advertising, and unfair competition.

11.    An Order requiring Defendant to pay Lilly's costs and attorney's fees in this action pursuant to 15 U.S.C. § 1117, California state law, and any other applicable provision of law.

12.    Other relief as the Court may deem appropriate.

Dated:  June 20, 2024

Respectfully submitted,
*/s/ Sharre Lotfollahi*

Sharre Lotfollahi (SBN 258913)
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, California 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900
slotfollahi@kirkland.com

Joshua L. Simmons (*pro hac vice* forthcoming)
Jeanna M. Wacker (*pro hac vice* forthcoming)
Ashley Ross (*pro hac vice* forthcoming)
Joshua C. Berlowitz (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
joshua.simmons@kirkland.com
jeanna.wacker@kirkland.com
ashley.ross@kirkland.com
josh.berlowitz@kirkland.com

Diana M. Watral (*pro hac vice* forthcoming)
James F. Hurst (*pro hac vice* forthcoming)
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
diana.watral@kirkland.com
james.hurst@kirkland.com

*Attorneys for Plaintiff*
*ELI LILLY AND COMPANY*

## **DEMAND FOR A JURY TRIAL**

Lilly hereby demands a jury trial for all issues so triable.

*/s/ Sharre Lotfollahi*
Sharre Lotfollahi (SBN 258913)
*Attorney for Plaintiff*
*ELI LILLY AND COMPANY*